**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MORGAN STANLEY SMITH BARNEY, LLC,

      Plaintiff,

v.                              Case No.:  3:18-cv-00141-J-34MCR

DANIEL J. ABEL,

      Defendant.

_____/

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

COMES NOW Defendant, DANIEL J. ABEL ("Mr. Abel"), by and through the undersigned counsel and pursuant to this court's January 23, 2018 Temporary Restraining Order ("Order"), hereby submits his Response in Opposition to Plaintiff's, MORGAN STANLEY SMITH BARNEY, LLC ("Plaintiff"), Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Incorporated Memorandum of Law in Support Thereof ("Pl.'s Emer. Mot.").  The entry of injunctive relief would be inappropriate because Plaintiff has not established a breach of contract under New York law, Plaintiff has failed to establish an actionable claim under the Florida Uniform Trade Secrets Act, Plaintiff has failed to establish any tortious interference on the part of Mr. Abel, and equity should not grant relief to Plaintiff in light of its past conduct with respect to encouraging and permitting the use of client information and solicitation.  In further support of this Response, Mr. Abel states:

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

1.      Mr. Abel began employment with Plaintiff in early 2014.  Aff. of Daniel J. Abel ¶¶ 13, 18 ("Abel Aff.").  At that time, Plaintiff hired Mr. Abel to be employed as a financial advisor.  Id. at ¶¶ 13, 18-19, 23.

2.      In total, Mr. Abel has 15 years of experience as a financial advisor.  Id. at ¶3. During this time, Mr. Abel has formed and created relationships with a number of clients—some of whom are family members of Mr. Abel—who trusted him to serve as their financial advisor. Id. at ¶¶ 2-8, 29, 35; see also id., Ex. B (identifying Mr. Abel's clients as of 2014).

3.      At the time that Mr. Abel transitioned to Plaintiff in early 2014, Plaintiff was part of what is known as the Broker Protocol ("the Protocol").  Id. at ¶9; see also id. at ¶¶ 10, 14-17, 29.  The Protocol provides, in relevant part,

> The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms.  If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm . . . .
>
> When RRs move from one firm to another and both firms are signatories to this protocol, they may only take the following account information:  client name, address, phone number, email address, and account title of the clients that they service while at the firm ("the Client Information") and are prohibited from taking any other documents or information.  Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her.  The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR.  . . . .
>
> . . . .

> RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms.

READ THE BROKER PROTOCOL, thebrokerprotocol.com/index.php/authors/read-the-protocol (last visited Jan. 25, 2018) (emphasis added).  Plaintiff was a member of the Protocol for more than a decade, and left the Protocol on November 3, 2017.  Abel Aff. at ¶9.

4.      At the time that Mr. Abel was being brought into Plaintiff, he was provided a "Financial Advisor Transition Policy & Acknowledgement" ("the Acknowledgement") that detailed Plaintiff's expectations for his transition.  Id., Ex. A.  The Acknowledgement provides in pertinent part that

> In connection with your transition to Morgan Stanley, the Firm expects that you will comply with applicable law and regulations, conduct yourself consistent with Industry standards, and with any instructions provided to you by Morgan Stanley and/or attorneys retained by Morgan Stanley on your behalf.
>
> Consistent with the foregoing policy and any obligations you owe your former employer, if your prior employer is not a member of [the Protocol], the Firm expects that you will retain at most only limited information for those clients you serviced at your prior employer that could be used to contact clients about your move to Morgan Stanley.

Id. (emphasis added); see also id. at ¶¶ 14-18, 29.

5.      The Acknowledgement is consistent with what Plaintiff had described previously was the prevailing trade practice or custom.  Id. at ¶29 (quoting Morgan Stanley Dean Witte, Inc. v. Frisby, 163 F. Supp. 2d 1371, 1379 (N.D. Ga. 2001)).

6.      When Mr. Abel joined Plaintiff in early 2014, he was leaving Merrill Lynch, which was also a member of the Protocol at that time.  Id. at ¶15.  Accordingly, Mr. Abel presented Merrill Lynch with what is known as a "protocol list."  Id.  Mr. Abel's protocol list identified the clients he was, or intended on, bringing with him to Plaintiff.  Id. at ¶15, Ex. B.

7.      As part of his onboarding to Plaintiff, Mr. Abel was also required to execute the "Financial Advisor Employment Agreement" ("the Agreement").  Id. at ¶¶ 19-22; see also Pl.'s Am. Compl., Ex. 1.  Mr. Abel was unexpectedly presented the Agreement on the very first day of his most recent period of employment with Plaintiff and instructed to sign it.  Id. at ¶¶ 19-22.  Mr. Abel was told it was a requirement of his employment that he sign it.  Id.  Plaintiff was afforded no meaningful review opportunity, input, or ability to consult with an attorney prior to executing the Agreement.  Id.

8.      The Agreement contains restrictive covenants.  See generally Pl.'s Am. Compl., Ex. 1.  The Agreement contains a New York choice of law provision.  Id. at 6.

9.       The Agreement prohibits the "use [of] Trade Secrets or other Company Records for any purpose other than the purpose of conducting the business of Morgan Stanley."  Id. at 2.  "Company Records" is very broadly defined in the Agreement as any "records, documents, and information concerning the business and affairs of Morgan Stanley and its employees."  Id.

10.      The Agreement also contains a non-solicitation provision.  Id. at 3.   The Agreement defines solicitation as follows:  the "initiation of any conduct with customers for the purpose of conducting business with or transferring accounts to any other person or firm that does business in any line of business in which Morgan Stanley or any of its affiliates is engaged."  Id.  No part of the Agreement purports to alter the "at-will" employment rule.[1]  Id.

11.      In the spring of 2015, Mr. Abel entered into what is known as a joint production arrangement with Ms. Michelle Paul.  Abel Aff. at ¶23.  However, Mr. Abel eventually exited this arrangement, choosing instead to be a Senior Registered Associate.  Id. at ¶25.

---

[1] Accordingly, Mr. Abel could submit his resignation at any time, with or without notice.  See J.R.D. Mgmt. Corp.v . Weiner, 883 So. 2d 314, 317 (Fla. 4th DCA 2004).

4

12.     The JP Policy provides in pertinent part that it "may be modified or changed by [Plaintiff] from time to time <u>in its sole discretion</u>."  Pl.'s Am. Compl., Ex. 2. at 1.  The JP Policy incorporates by reference the Agreement.  <u>Id.</u> at 3 ("[A]ny provisions contained in their individual Employment Agreements with the Firm, or any of its affiliates, parents, successors or predecessors, and other agreements or policies they have agreed to with the Firm relating to any restrictive covenants, non-disclosure, confidentiality, non-solicitation, damages and/or remedies, if any, are incorporated herein.").

13.     The JP policy contains a restrictive covenant purporting to prohibit Mr. Abel from "solicit[ing] any Client Accounts or retain[ing] any information regarding any such Client Accounts."  <u>Id.</u>  The definition of "solicit" is the same as that provided in the Agreement.  <u>Compare id.</u>, Ex. 1 at 3 <u>with</u> <u>id.</u>, Ex. 2 at 3.

14.     At no time during Mr. Abel's employment with Plaintiff did he contact a customer or client for the purpose of selling products or services that are competitive with Plaintiff or causing accounts to be transferred in a manner competitive with Plaintiff.  Abel Aff. at ¶27.

15.     Mr. Abel tendered his resignation to Plaintiff on January 12, 2018.  <u>Id.</u> at ¶26.

16.     Upon leaving, Mr. Abel did not remove or retain any lists, documents, or storable information created or compiled by Plaintiff.  <u>Id.</u> at ¶¶ 28, 32.  The only document Mr. Abel retained was an account liquidation form.  <u>Id.</u> at ¶28.  The document is boilerplate and is filled out by the customer or client.  <u>Id.</u>, Ex. C.

17.     Plaintiff filed suit against Mr. Abel on January 22, 2018.  <u>See generally</u> Pl.'s Compl.  Shortly after filing its Complaint, Plaintiff filed an Amended Complaint.  <u>See generally</u> Pl.'s Am. Compl.  Plaintiff's Amended Complaint alleges the following causes of action against Mr. Abel:  (1) breach of contract, (2) violation of the Florida Uniform Trade Secret Act

("FUTSA"), (3) tortious interference with business relationship; and (4) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA").  Id. at ¶¶ 27-54.

18.     Plaintiff also filed its Emergency Motion on January 22, 2018.  See generally Pl.'s Emer. Mot.  Therein, Plaintiff claims that it is likely to prevail on its breach of contract, FUTSA, and tortious interference claims.  Id. at 6-12.  Plaintiff further asserts that it has established the other elements necessary to securing injunctive relief.  Id. at 12-16.

19.     According to Plaintiff, Mr. Abel has entered into certain enforceable agreements (utilizing Florida law and failing to raise the controlling choice of law provision in the Agreement, which has been incorporated by reference into the JP Policy) that he has breached by "soliciting" its clients.  Id. at 6-8.  Plaintiff only identified the following clients as having been "solicited:"  David Donovan and Diane and Donald Patchen.  Pl.'s Am. Compl., Ex. 3 at 3; Supp. Declaration of Albert S. Toto, III ("Supp. Toto") ¶5; see also Abel Aff. at ¶¶ 8, 17.  Plaintiff further alleges that Mr. Abel has misappropriated trade secrets.  Pl.'s Emer. Mot. at 8-11. Plaintiff fails to allege the taking of any specific list or compilation, instead insisting that all of its customer information is a trade secret.  Id. at 4, 5, 9-10.  Finally, based upon Mr. Abel's breach and misappropriation, Plaintiff alleges that he has also committed tortious interference. Id. at 12.

## II.     PLAINTIFF HAS NOT CLEARLY ESTABLISHED ITS RIGHT TO THE EXTRAORDINARY RELIEF IT SEEKS

"'A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.'"  Forsyth Cnty. v. U.S. Army Corps. of Engrs., 633 F.3d 1032, 1039 (11th Cir. 2011) (citation omitted) (emphasis added).  To secure a preliminary injunction, the movant must clearly establish:  (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the

injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. Id. "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002) (citation omitted).

The movant must adduce specific facts in support of each of the foregoing elements. See Fed. R. Civ. P. 65(b)(1)(A); M.D. Fla. R. 4.06(b)(2); see also Digital Generation, Inc. v. Boring, No. 3:12-CV-000329-L, 2012 U.S. Dist. LEXIS 12886 at *8-10 (N.D. Tex. Feb. 2, 2012) (denying request for injunctive relief as too speculative).  Hearsay evidence may be considered by the court in determining whether an injunction should or should not be entered. Levi Strauss & Co. v. Sunrise Intl. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995).  However, the district court is vested with discretion in awarding injunctions and, therefore, may assign little or no weight to hearsay evidence. See All Care Nursing Serv. v. Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989); Popular Bank v. Banco Popular, 9 F. Supp. 2d 1347, 1361-62 (S.D. Fla. 1998) (assigning little weight to testimony of corporate employee who testified to customer confusion in trademark case).

The entry of an injunction would be inappropriate in this case.  Plaintiff has, for reasons discussed at greater length infra, not clearly met its burden of persuasion on any of the elements necessary to secure injunctive relief.  Fundamentally, Plaintiff is not entitled to injunctive relief because, despite its handwringing over Mr. Abel's alleged conduct, it has for years condoned and encouraged that very same conduct.  Equity should not be utilized to aid Plaintiff in light of its unclean hands.  It is respectfully requested that Plaintiff's Emergency Motion be denied.

**A.      *Plaintiff Cannot Establish a Likelihood of Success on the Merits***

Plaintiff cannot establish a likelihood of success here for several reasons.   While Plaintiff's Emergency Motion curiously assumed Florida law applies, New York law clearly governs.   Pursuant to New York law, Plaintiff cannot establish a breach by Mr. Abel.   Plaintiff has also failed to establish a trade secret.   In light of the foregoing, Plaintiff has not tortiously interfered with Plaintiff's (largely unidentified) relationships.

**1.      New York Law Governs Plaintiff's Breach of Contract Claim**

"In Florida, when contracting parties indicate in the contract their intention as to the governing law, any dispute under the contract will be governed by such law as long as it is not against Florida's public policy."   Videojet Techs. Inc. v. Garcia, No. 8:07-CV-1407-T-30MAP, 2008 U.S. Dist. LEXIS 4605 at *10 (M.D. Fla. June 12, 2008) (citations and footnote omitted). "[T]he countervailing public policy must be sufficiently important that it outweighs the policy protecting freedom of contract.  . . . [R]outine policy considerations are insufficient to invalidate the choice of law provision."   Id. (citation omitted) (alteration in original in part).   The party seeking to avoid the choice of law provision bears the heavy burden of convincing the court that "'great prejudice'" will inure to the "'dominant public interest.'"   Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000).   Florida courts have enforced choice of law provisions where the chosen law is more favorable to the employee than Florida law.   See, e.g., Punzi v. Shaker Advertising Agency, Inc., 601 So. 2d 599, 600 (Fla. 2d DCA 1992); see also Mazzoni Farms, Inc., 761 So. 2d at 311-12 (citing Punzi favorably).[2]

Here, the Agreement—which has been incorporated in full into the JP Policy—provides that it "will be governed, construed and enforced in accordance with the laws of the state of New

_____

[2] But see Temporarily Yours-Temporary Help Servs., Inc. v Manpower, 377 So. 2d 825, 827 (Fla. 1st DCA 1979). It is important to note that Manpower's choice of law ruling has never been cited by another Florida district court of appeal and Punzi was cited favorably by the Florida Supreme Court.

York."  Pl.'s Am. Compl., Ex. 1 at 6.[3]   Further, Plaintiff should not be heard to contest the

legality of a term it insisted upon.  Accordingly, pursuant to the Agreement's plain terms, New

York law governs the breach of contract claim brought by Plaintiff.  See Krock v. Lipsay, 97

F.3d 640, 645 (2d Cir. 1996) (construing scope of substantially identical contract language).

### 2.        Plaintiff has Not Established a Likelihood of Breach Under New York Law

New York adheres to a public policy in favor of free competition and, therefore, enforces

restrictive covenants "only to the extent that they are reasonably necessary to protect the

legitimate interests of the employer and [are] not unduly harsh or burdensome to the one

restrained."  Post v. Merrill Lynch, Pierce, Fenner & Smith, 48 N.Y.2d 84, 87 (N.Y. 1979).

Thus, "[a] restraint is reasonable only if it:  (1) is no greater than is required for the protection of

the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and

(3) is not injurious to the public."  BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89 (N.Y.

1999).  The burden is on the employer to establish each of the foregoing three (3) elements, and

overbreadth as to any one renders the entirety of the covenant invalid.  Id.  Should a restrictive

covenant seek to protect interests an employer cannot legitimately protect or extend

unreasonably in time or area, the covenant will be presumed unenforceable.  Pure Power Boot

Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 512 (S.D.N.Y. 2011)

(ruling nonsolicitation to be unreasonable in geographic area because it lacked one); Scott,

Stackrow & Co. v. Skavina, 9 A.D.3d 805, 806 (N.Y. App. Div. 2004) (finding nonsolicitation to

be unreasonable where it was overbroad as to protection of employer's legitimate interests).

---

[3] The facts presented by Plaintiff do not clearly establish what law governs the code of conduct cited in its Amended
Complaint.  See generally Pl.'s Am. Compl.; Pl.'s Emer. Mot.  Nor is it entirely clear whether Plaintiff is alleging in
its Emergency Motion that the code of conduct is enforceable and being used to support its request for injunctive
relief.  See Pl.'s Emer. Mot. at 8.  Nevertheless, and presuming Florida law applies, the code is likely unenforceable.
One, Plaintiff has brought forward no proof that it was signed by Mr. Abel as required by law.  § 542.335(1)(a), Fla.
Stat. (2017).  Two, Plaintiff has made no effort to demonstrate why this clear policy statement has overcome the
legal presumption that it fails to create an enforceable agreement.  See Vega v. T-Mobile, USA, Inc., 564 F.3d 1256,
1273 (11th Cir. 2009) (citing cases).

Nevertheless, overbroad and unreasonable restraints against trade may be partially enforced in limited circumstances.  See Skavina, 9 A.D.3d at 807 (citation omitted).

Plaintiff cannot establish a breach of the Agreement.[4]  The restrictive covenants at issue are patently overbroad.  The nonsolicitation lacks any geographic scope.  Further, as detailed infra, the confidentiality and nonsolicitation covenants seek to protect more than Plaintiff is entitled to under New York law.  Finally, partial enforcement is not appropriate in this case in light of Plaintiff's anti-competitive misconduct.

**a.** **Plaintiff has failed to establish a legitimate business interest and its covenants are facially overbroad in this respect in any event**

Among the legitimate business interests ("LBI") recognized as protectable is employer good will.  Id. at 806 (citation omitted).  Therefore, an employer may protect those "relationships that the employer assisted the employee in developing through the employee's performance of services in the course of employment."  Id. (citations omitted).  But employers may go no further.  Id. ("A covenant will be rejected as overbroad . . . if it seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his . . . employment or if the covenant extends to personal clients recruited through the employee's independent efforts." (citation omitted)); see also Weiser LLP v. Coopersmith, 74 A.D.3d 465, 467-68 (N.Y. App. Div. 2010) (finding clients who were also family were independently created).

Employers may also protect against the misappropriation of trade secrets and confidential information.  See Pure Power Boot Camp, Inc., 813 F. Supp. 2d at 510-11 (discussing

---

[4] This Response focuses on the Agreement because it is the only otherwise enforceable agreement between the parties.  Supra n. 3.  The JP Policy gives Plaintiff the right to alter any of its terms at any point in time. Pl.'s Am. Compl., Ex. 3 at 1.  As such, it is clearly illusory and lacking in an exchange of promises.  See Curtis Props. Corp. v. Greif Cos., 212 A.D.2d 259, 265 (N.Y. App. Div. 1995).  Nevertheless, the scope of the JP Policy is at least as broad as the Agreement and, therefore, it suffers from the same defects.  Infra Part II.A.2.a.

confidentiality and trade secret protection in context of customer information); see also Smith Barney Div. of Citigroup Global Mkts. v. Griffin, No. 08-0022-BLS1, 2008 Mass. Super. LEXIS 44 at *18-21 (Mass. Dist. Ct. Jan. 23, 2008) (applying New York law and discussing confidentiality of client information belonging to financial advisors in light of the Protocol). However, information "readily discoverable through public sources," such as "telephone books, trade publications, referrals and social contacts," is not protectable. Riedman Corp. v. Gallager, 48 A.D.3d 1188, 1189 (N.Y. App. Div. 2008) (citations omitted) (emphasis added). Likewise, "an employee's recollection of information pertaining to the needs and habits of particular customers is not actionable." Buhler v. Michael P. Maloney Consulting, Inc., 299 A.D.2d 190, 191 (N.Y. App. Div. 2002) (citations omitted); see also DeWitt Stern Group v. Eisenberg, No. 13 Civ. 3060, 2013 U.S. Dist. LEXIS 155134 at *17-18 (S.D.N.Y. Oct. 29, 2013) (discussing New York law in context of confidentiality of customer information); Johnson Controls, Inc. v. A.P.T. Critical Sys., 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) ("[A]bsent the physical removal of actual contracts or client lists, it is difficult to show the misappropriation of these types of trade secrets or confidential information." (citation omitted)); Walter Karl, Inc. v. Wood, 137 A.D.2d 22, 27-28 (N.Y. App. Div. 1988) (finding no claim could lie where employee secured transfer of former customer accounts "based upon the defendant's personal familiarity with and knowledge of their needs as well as his outstanding ability in the field."); Precision Concepts, Inc. v. Bonsanti, 569 N.Y.S.2d 124, 125-26 (N.Y. App. Div. 1991) (same).

Plaintiff has failed to establish the existence of a LBI. The only cognizable allegations of customer relationships made by Plaintiff are those with "D.D." and "Mr. and Mrs. P." Pl.'s Am. Compl., Ex. 3 at 3; Suppl. Toto at ¶5.[5] However, neither of these relationships is protectable.

---

[5] Aside from these customers, Plaintiff's allegations of protectable relationships with customers amount to nothing more than speculation. It is largely impossible for Mr. Abel or this court to assess whether the relationships

The client identified as "D.D." is Mr. Abel's uncle, David Donovan.  The clients identified as "Mr. and Mrs. P" are Don and Diane Patchen, and have trusted Mr. Abel since his time with Merrill Lynch; indeed, they were listed on his protocol list in 2014.  Abel Aff., Ex. B.  These clients were created independently by Mr. Abel.

It is unclear from Plaintiff's Emergency Motion precisely what information that is protectable has been misused.[6]  See generally Pl.'s Emer. Mot.  Nevertheless, a careful reading of the motion indicates Plaintiff is attempting to argue that all customer information—including basic contact information—is protectable.  See id. at 3.  Plaintiff's contention is without merit here.  It is disingenuous for Plaintiff to claim that it has taken every precaution to protect and prevent the dissemination of all client information.  Pl.'s Emer. Mot. at 3-5.  For nearly two (2) decades Plaintiff has routinely permitted the dissemination of much of this information.  Abel Aff. At ¶¶ 9, 13-18, 29.  Likewise, unless Plaintiff wishes to admit it engaged in the systematic violation of the Gramm-Leach-Bliley Act, information pertaining to a customer's name, address, telephone number, email address, and account title cannot be considered non-public and it should be estopped from arguing otherwise.  See Smith Barney Div. of Citigroup Global Mkts., 2008 Mass. Super. LEXIS 44 at *20-21.[7]  Even in the absence of the Protocol, Plaintiff encouraged Mr. Abel and others to utilize much of the client information it now alleges is "confidential" and

---

purportedly at issue are protectable if they have not been identified.  Cf. Bortell v. White Mts. Ins. Group, Ltd., 2 So. 3d 1041, 1048-49 (Fla. 4th DCA 2009); Sarkis v. Pafford Oil Co., 697 So. 2d 524, 526-27 (Fla. 1st DCA 1997).  That said, it is quite clear that Plaintiff cannot preclude Mr. Abel from soliciting those clients with whom he has not previously worked as it appears it has alleged in one paragraph.  Pl.'s Am. Compl, Ex. 3 at 4.  Further, the failure of Plaintiff to identify these customers that have allegedly been solicited away, combined with the multiple layers of hearsay upon which the remainder of Mr. Albert Toto's testimony rests upon, calls into serious question its veracity.

[6] Similarly to its allegations relating to protectable customer relationships, the majority of Plaintiff's "allegations" of misuse of confidential or trade secret information are non-descript and conclusory.  Pl.'s Am. Compl., Ex. 3 at 1, 2-3; Suppl. Toto at ¶11.  As a consequence, it is impossible for Mr. Abel or this court to assess whether the information purportedly taken or misused is confidential or a trade secret.  Cf. Am. Registry, LLC v. Hanaw, No. 2:13-cv-352-FtM-29UAM, 2013 U.S. Dist. LEXIS 171889 at *9-10 (M.D. Fla. Dec. 5, 2013).  The use of Plaintiff of posturing and innuendo (largely) in place of the actual identification of misused confidential business information or trade secrets—particularly when Plaintiff has allegedly already conducted a forensic examination—calls into serious question its veracity.

[7] See also 12 C.F.R. § 332.3(n)(2)-(3) (defining and delimiting nonpublic information).

"secret." Abel Aff. at ¶29, Ex. B.  Unless Plaintiff is willing to admit it engaged in systematic tortious interference and misappropriation of trade secrets, its claim that <u>all</u> customer information is protectable must fail.

Further, Mr. Abel has retained no physical lists compiled by Plaintiff nor any other compilation containing client information.  <u>Id.</u> at ¶¶ 29, 32.  And much of the information Plaintiff alleges is confidential was compiled by Mr. Abel himself through public sources.  <u>Id.</u> at ¶¶ 4-8, 30-34, Ex. B.  Plaintiff has failed to make any argument as to why Plaintiff should be enjoined from utilizing <u>all</u> customer information under these circumstances.  Moreover, Plaintiff's allegations of the expense and effort allegedly necessary to have compiled its list, or this information, is boilerplate, self-serving, conclusory, and should be given no weight.  Pl.'s Emer. Mot at 3.

In addition to failing to demonstrate a LBI, Plaintiff's covenants are patently overbroad. Its nonsolicitation covenant prohibits Mr. Abel from soliciting <u>any</u> customer with whom he worked or whose names became known to him (and consequently, do not necessarily need to have been serviced by him) during his period of employment with Plaintiff.  Pl.'s Am. Compl., Ex. 1.  This is facially broader than what Plaintiff is lawfully allowed to restrain.  Likewise, its confidentiality covenant encompasses every document and record concerning Plaintiff.  <u>Id.</u> Plaintiff cannot legitimately claim that each and every document it creates or possesses is confidential or proprietary (indeed, per Plaintiff's own allegations, a great many are presumably utilized for advertising).  Plaintiff's restrictive covenants are unenforceable because they are overbroad and it has failed to establish the existence of a legitimate business interest.

**b.      Although Plaintiff has failed to seek such relief, partial enforcement of its unenforceable covenants is not appropriate**

While overbroad covenants are presumptively invalid, courts will consider partially enforcing them in limited circumstances.  See Skavina, 9 A.D.3d at 807 (citation omitted).  "Partial enforcement may be justified if an employer demonstrates, in addition to [a] legitimate business interest . . ., 'an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct.'"  Id. (citation omitted).  Courts have refused to partially enforce a restrictive covenant where the employee is required to sign the agreement containing the restrictive covenant as a condition of employment or continued employment, without an opportunity for meaningful review or input, without the opportunity to seek counsel, and without any benefit beyond continued employment.  Pure Power Boot Camp, Inc., 813 F. Supp. 2d at 509 (citing cases).

Assuming Plaintiff could establish a LBI, enforcement of the covenants at issue would not be appropriate even on a partial basis.  Plaintiff compelled Mr. Abel to execute the Agreement without providing him any further consideration beyond his continued employment.  Abel Aff. at ¶¶ 20-21.  Further, the Agreement was sprung upon Plaintiff without notice, and he was given no opportunity for input or meaningful review and reflection.  Id. at ¶¶ 19-22.  Similarly, Plaintiff would have received no added consideration for executing the JP Policy, see id. at ¶34, and Plaintiff has adduced no facts suggesting partial enforcement of that agreement is appropriate.  Thus, the covenants at issue are unenforceable in their entirety.

**3.      Assuming Florida law applies, Plaintiff has Failed to Establish a Breach of the Agreement**

"Every contract, combination, or conspiracy in restraint of trade or commerce in [Florida] is unlawful."  § 542.18, Fla. Stat. (2017); see also John A. Grant, Jr. & Thomas T. Steele,

Restrictive Covenants:  Fla. Returns to the Original "Unfair Competition" Approach for the 21st Century, 70 Fla. B.J. 53, 54 (1996).  Restrictive covenants are only valid if they pass muster under section 542.335.  § 542.335(1), Fla. Stat; see also Evans v. Generic Solution Eng'g, LLC, 178 So. 3d 114, 116 (Fla. 5th DCA 2015).  To pass muster under the statute, the plaintiff must "plead and prove" the existence of one or more LBIs, the existence of harm being done to the interest(s) identified such that enforcement is reasonably necessary, and that the relief must be tailored to redress the harm.  § 542.335(1)(b), Fla. Stat.; Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1233 n.9 (11th Cir. 2009); Evans, 178 So. 3d at 116.

Plaintiff has not established a LBI.  As discussed supra and infra, what allegedly proprietary information has been identified (all client information) is not protectable because it is neither a trade secret nor confidential.  Supra Part II.A.2.a; Infra Part II.A.4.; see also Grant & Steele, supra, at 54 (discussing pleading requirements for establishing confidential information).  Further, client relationships are not "substantial" unless there were developed and established during the employee's period of employment with the plaintiff and with its assistance.  See Deloitte & Touche USA LLP v. Lamela, No. 1542-VCP, 2007 Del. Ch. LEXIS 44 at *27 & n.45 (Chanc. Ct. Del. Apr. 6, 2007) (citations omitted); Grant & Steele, supra at 54; see also Evans, 178 So. 3d at 116 (discussing other factors relevant to this inquiry); Anich Indus., Inc. v. Raney, 751 So. 2d 767, 771 (Fla. 5th DCA 2000) (same).  As discussed supra, the only clients Plaintiff has identified were created independently of it and, hence, are not protectable.  Supra Part II.A.2.a.  Further, Plaintiff's prior statements demonstrate it views clients as choosing financial advisors based on personal relationships and not based on what the institution might offer, which weighs against its claim.  Abel Aff. at ¶¶ 29, 35.

15

### 4.    Plaintiff has Not Demonstrated a Likelihood of Success on its FUTSA Claim

Plaintiff and its counsel have previously expounded upon the law of trade secrets in the context of customer information, which was well-sourced and well-written:

> Florida law and not private contracts determines what qualifies as a "trade secret."  To be a protectable "trade secret," the information must "not be readily ascertainable by proper means." Fla. Stat. Ann. § 688.002 (4).  Customer lists are not trade secrets or confidential information unless they contain information not generally known or readily available from public sources. Barbiero-Powell v. Bernstein Leibstone Associates, Inc., 624 So.2d 383 (Fla. 4th DCA 1993) (reversing injunction against former employee due to lack of evidence a list was compiled at great expense or that the information was not otherwise available in the business community).  Absent evidence that a customer list was the product of great expense or effort, that it was a distillation of a larger list, or that it included information not available from public sources, a customer list cannot be protected.   Templeton v. Creative Loafing Tampa, Inc., 552 So.2d 288 (Fla. 2d DCA 1989).

> Therefore, Mr. Fonseca's compilation of customer names from memory and public information found on the internet is not a trade secret.  Mr. Fonseca did not take a list of any kind from AAFCU, but rather the customer information was compiled by his own efforts and from publically available sources.  Mr. Fonseca knew the identities of the clients he serviced.  "A former employee cannot be precluded from utilizing . . . customer lists she herself develops." Mittenzwei v. Indus. Waste Serv., Inc., 618 So. 2d 328, 329-30 (Fla. 3d DCA 1993).  Moreover, employees are free to reconstruct customer lists using their own memory and publicly available sources.  See Harry G. Blackstone, D.O. v. Dade City Osteopathic Clinic, 511 So. 2d 1050, 1051-52 (Fla. 2d DCA 1987) (former employee did nothing wrong when he "compiled his list of addresses from patients themselves, from the phone book, and from his own memory").

See Ex. 1 at 10-11;[8] see also Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) (stating that "plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy" and ruling plaintiff had failed to carry its burden to secure injunction (citation

---

[8] From a review of the docket in that matter, no order has yet been issued by the judge assigned to the case.

omitted) (emphasis added)); <u>Sethscot Collection, Inc. v. Drbul</u>, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996) (ruling that an active customer list was a trade secret but that defendant could not be precluded from utilizing personal recollection or lists created himself); <u>Templeton</u>, 552 So. 2d at 290 ("Appellant cannot be precluded from utilizing contacts and expertise gained during his former employment . . . or even customer lists he himself developed." (citations omitted)).

Plaintiff is incorrect that <u>all</u> client information is a trade secret it may protect.  As recognized by Plaintiff and its counsel, Mr. Abel may utilize his memory, public information, and those lists created himself.  Mr. Abel has taken no list or other compilation from Plaintiff. Abel Aff. at ¶¶ 28, 32, 36; <u>see also</u> <u>supra</u> Part II.A.2.a.  Further, Plaintiff's position that <u>all</u> customer contact information is a trade secret, or even confidential, is without merit considering that it has, for years, been permitting and encouraging the use and dissemination of this very type of information.  <u>Id.</u> at ¶¶ 9-10, 29, Ex. B.  Moreover, Plaintiff's allegations of the great expense and time needed to accumulate this customer information is boilerplate and conclusory.  <u>See</u> Pl.'s Emer. Mot at 3.  Accordingly, Plaintiff cannot establish a violation of FUTSA.

### 5.    Plaintiff has Not Established a Likelihood of Success on its Tortious Interference Claim

"The elements of tortious interference with a business relationship are:  (1) the existence of a business relationship under which the plaintiff has legal rights; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the business relationship."

This cause of action requires "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."

Bortell, 2 So. 3d at 1048 (citations omitted).  Intentional and unjustified conduct may be demonstrated by establishing malice[9] on the part of, or the use of improper means by, the tortfeasor.  KMS Restaurant Corp. v. Wendy's Intl., Inc., 361 F.3d 1321, 1327-28 (11th Cir. 2004) (discussing Florida law); see also Restatement (Second) of Tort § 767 (outlining relevant factors to consider).  However, since "the competitive free enterprise system" is "the basis for the American economy and our very way of life," competition for business is not actionable interference even if it is intentional.  Wackenhut Corp. v. Maimone, 389 So. 2d 656, 657-58 (Fla. 4th DCA 1980).  Indeed, "'[s]o long as improper methods are not employed, activities taken to safeguard one's own financial . . . interests are entirely non-actionable.'"  KMS Restaurant Corp., 361 F.3d at 1327 (citation omitted); see also Ex. 1 at 19-20.

Mr. Abel has not violated any enforceable restrictive covenant or FUTSA.  Supra Part II.A.1-4.  Moreover, Plaintiff has not established or even attempted to argue that Mr. Abel's motives were solely malicious.  See generally Pl.'s Emergency Mot. at 12.  The customers Mr. Abel has contacted, as sufficiently identified by Plaintiff, consist of a familial relation and a client with whom he has worked with since before his time with Plaintiff.  Abel Aff. at ¶¶ 8, 17.  Furthermore, Mr. Abel took no physical and stored information with him to which Plaintiff has protectable rights.  Id. at ¶¶ 28, 32, 36.  Thus, Mr. Abel has committed no tortious interference.

### B.     There is no Substantial Threat of Irreparable Harm

"Irreparable harm is the 'sine qua non of injunction relief.'  Without a finding of a likelihood of an 'actual and imminent' irreparable injury, preliminary injunctive relief is improper."  Br-111 Imps. & Exps., Inc. v. Indusparquet Industria E Comercio de Madeiras Ltda., No. 10-22206-Civ-GRAHAM/TORRES, 2010 U.S. Dist. LEXIS 113272 at *23-25 (S.D. Fla.

---

[9] But, where improper actions are not taken, the motive must purely and solely be malicious.  Prieto v. Collier Cnty, No. 2:13-cv-489-FtM-38CM, 2014 U.S. Dist. LEXIS 124644 at *17-19 (M.D. Fla. Sept. 24, 2014).

Sept. 23, 2010) (citations omitted) (alteration in original).  Consistent with the equitable nature of injunctive relief, courts have concluded no irreparable harm is demonstrated where a party has permitted or encouraged the very conduct it later seeks to enjoin.  <u>See, e.g.</u> <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Baxter</u>, No. 1:09CV45DAK, 2009 U.S. Dist. LEXIS 31326 at *11-18 (D. Utah Apr. 9, 2009); <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brennan</u>, No. 1:07CV475, 2007 U.S. Dist. LEXIS 34501 at *6-8 (N.D. Ohio Feb. 23, 2007); <u>Smith Barney</u>, 2008 Mass. Super. LEXIS 44 at *22-25; <u>see also</u> <u>Frisby</u>, 163 F. Supp. 2d at 1380.

Plaintiff has not demonstrated irreparable harm.  It has failed to demonstrate a likelihood of success and, therefore, an imminent injury.  Further, the majority of Plaintiff's claims of harm are largely speculative and boilerplate.  <u>See</u> Pl.'s Am. Compl., Ex. 3 at 1-5 (utilizing terms such as "believe," "will likely," "it is my opinion," and relying on testimony containing multiple layers of hearsay, some of which does not even indicate that anything untoward or unlawful occurred) Finally, equity should not be used to enjoin the same behavior Plaintiff has systematically condoned and encouraged.  <u>See</u> Abel Aff. at ¶¶ 9, 10, 15-18, 29, Exs. A-B.

### C.   *The Balance of Equities Weighs in Favor of Mr. Abel*

Plaintiff has failed to carry its burden of demonstrating a likelihood of success on the merits.  Beyond Plaintiff's few actual allegations of unlawful conduct by Mr. Abel (which were not, in fact, unlawful), it has provided nothing beyond conjecture and innuendo to support its Emergency Motion.  <u>Supra</u> Part II.B.  To enter an injunction under these circumstances would unreasonably interfere with Mr. Abel's livelihood and his ability to continue to provide trusted financial advice to his clients.  <u>Cf.</u> <u>Variable Annuity Life Ins. Co. v. Laeng</u>, No. 8:12-cv-2280-T-33MAP, 2013 U.S. Dist. LEXIS 18107 at *23-24 (M.D. Fla. Jan. 2, 2013) (finding balance of

equities weighed in favor of former financial advisor).  Further, equity should not aid Plaintiff's

unclean hands.  <u>Supra</u> Part II.B.

### D.      *Injunctive Relief Would Not Serve the Public Interest*

The greater public interest in this matter is the right of clients to have access to the

financial advisors of their choice for several reasons.  <u>See, e.g.</u>, <u>Laeng</u>, 2013 U.S. Dist. LEXIS

18107 at *23-24 (citations omitted).  One, Plaintiff hasn't been harmed in any legally cognizable

way by Mr. Abel's conduct.  <u>Supra</u> Part II.A.  Two, Plaintiff and the industry it belongs to at-

large have recognized the importance of open competition and client choice.  Ex. 1 at 17-19;

Abel Aff. at ¶¶ 9, 10, 15-18, 29, Exs. A-B; <u>see also</u> <u>Frisby</u>, 163 F. Supp. 2d at 1380 (refusing to

enter an injunction on policy grounds where movant came to court with unclean hands).  Further,

the Financial Industry Regulatory Authority, Inc. has recognized the importance of client choice

in their financial advisors.  <u>See</u> FINRA R. 2140.  Thus, refusing to enter an injunction against

Mr. Abel would serve the public interest.

### III.      CONCLUSION

Plaintiff's Emergency Motion should be denied.  What little cognizable facts Plaintiff

alleges are insufficient to satisfy, much less clearly satisfy, any one of the four elements

necessary to obtain injunctive relief.  In sum, Plaintiff has failed to meet the demanding standard

and should not be awarded the extraordinary and rare relief it seeks.  It is respectfully requested

that Plaintiff's Emergency Motion be denied.

Respectfully submitted,

/s/ Ronald P. Angerer, II
Archibald J. Thomas, III
Florida Bar No. 231657
archibald@job-rights.com
Ronald P. Angerer, II
Florida Bar No. 0104874
ronald@job-rights.com
ARCHIBALD J. THOMAS, III, P.A.
4651 Salisbury Road, Suite 255
Jacksonville, Florida 32256
(904) 396-2322 (Telephone)
(904) 296-2341 (Facsimile)
ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 30, 2018, I served a copy of the forgoing DEFENDANT'S RESPONSE IN OPPOSITION OF PLAINTIFF'S EMERGENCY MOTION FOR TERMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Michael S. Taaffe, Esq.
Michael D. Bressan, Esq.
Shumaker, Loop & Kendrick, LLP
240 S. Pineapple Ave.
P.O. Box 49948
Sarasota, FL 34230-6948
Telephone: (941) 366-6660
Fax: (941) 366-3999
mtaaffe@slk-law.com
mbressan@slk-law.com

*Attorneys for Plaintiff*

/s/ Ronald P. Angerer, II
Attorney

# EXHIBIT 1

# EXHIBIT 1

Filing # 64133498 E-Filed 11/13/2017 06:36:39 PM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

AMERICAN AIRLINES FEDERAL
CREDIT UNION,

GENERAL JURISDICTION DIVISION

                    Plaintiff,

Case No.: 2015-017241-CA-01

v.

CARLOS HERNAN FONSECA, and
MORGAN STANLEY SMITH BARNEY LLC,

                    Defendants.

## MORGAN STANLEY SMITH BARNEY LLC AND CARLOS HERNAN FONSECA'S MEMORANDUM IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Pursuant to Florida Rule of Civil Procedure 1.510, Defendants Morgan Stanley Smith Barney LLC ("Morgan Stanley") and Carlos Hernan Fonseca ("Fonseca") respectfully request that this Court grant summary judgment. Defendants are entitled to judgment as a matter of law on American Airlines Federal Credit Union's ("AAFCU") claims for breach of the Non-Use and Non-Disclosure of Confidential Information Covenant ("Non-Disclosure Covenant"), breach of the Non-Solicitation/Non-Acceptance/Non-Interference Covenant, misappropriation of trade secrets, unjust enrichment and tortious interference with business relations.

AAFCU bases its Non-Disclosure Covenant and misappropriation claims on Mr. Fonseca's provision of gross production and gross asset information to Morgan Stanley during his discussions with Morgan Stanley about potential employment. This information, however, contained no customer information. Instead, it documented Mr. Fonseca's personal earnings, monthly gross commissions, amount of assets under his care, and types of investment holdings

1



held by his customers on a macro level. This information is not confidential and on its face is not a trade secret as it has no independent economic value.

It is undisputed that Mr. Fonseca took no other information. Mr. Fonseca and Morgan Stanley anticipate that AAFCU will argue Mr. Fonseca's possession of customer names and contact information is a trade secret and constitutes confidential information used in violation of the Non-Disclosure Covenant, but the undisputed facts show that Mr. Fonseca used his memory and looked up contact information via Spokeo, a public internet directory of contact information. These remembered names and publicly available addresses and telephone numbers are not trade secret information. To the extent AAFCU claims Mr. Fonseca's memory of his customers' names is confidential information and that he is barred from using or disclosing such information, that interpretation creates a de facto restrictive covenant in perpetuity unenforceable as a matter of Texas law, which applies to AAFCU's contract claims.

AAFCU's claim for breach of the Non-Solicitation/Non-Acceptance/Non-Interference Covenants fails as these provisions are overly broad and unenforceable as a matter of law. AAFCU may not restrict Mr. Fonseca from soliciting clients—or even *accepting* clients—for brokerage and investment advisory services when AAFCU admittedly does not and, by law, may not provide such services to the public. AAFCU has no legitimate business interest to restrict such activity. **AAFCU, in fact, admits that it does not offer brokerage services to the public.** AAFCU's true purpose is to inappropriately restrict Mr. Fonseca—who was a registered securities professional at Cetera Investment Services, LLC a third-party broker-dealer—from offering broker-dealer services to AAFCU members or even accepting such requests for services, because AAFCU ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with Cetera based ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ a dual employee like Mr. Fonseca ▮▮▮▮▮▮▮▮▮▮▮▮. Under Texas

2

law, AAFCU has no legitimate business interest in preventing this type of competition from Mr. Fonseca simply because of its contractual relationship with Cetera.

Finally, in order to avoid an arbitration provision, AAFCU stated, time and again, that the broker-dealer services Mr. Fonseca provided are not at issue in this case. Indeed, the District Court of Appeal found that AAFCU's claims flowed *only* from the 2008 Employment Agreement, not the broker-dealer dual employment agreement which addressed brokerage services. Pursuant to judicial estoppel, AAFCU cannot now argue otherwise. Thus, AAFCU is stuck arguing that an overly broad restrictive covenant is necessary to protect its credit union business even though the provision restricts Mr. Fonseca from providing services that AAFCU explicitly does not and may not offer. For these reasons, Morgan Stanley is entitled to summary judgment on all claims and AAFCU's Amended Complaint should be dismissed.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Two agreements governed Carlos Fonseca's employment at AAFCU.

Carlos Fonseca entered into an Employment Agreement with AAFCU (the "2008 Employment Agreement") on or around June 4, 2008. (*See* Statement of Undisputed Material Facts ("SUMF") No.1; Am. Compl., Ex. A). Two years later, Mr. Fonseca executed a "'Dual Employment' and Noncompetition Agreement for Service Center Investment Executive" ("2010 Dual Employment Agreement") on or around September 13, 2010. (*See* SUMF No. 2; Deposition of Carlos Fonseca ("Fonseca Dep."), Ex. 5 (SLK-FONSECA-000020-22)). This second agreement was executed by Mr. Fonseca, AAFCU, and the broker-dealer PrimeVest Financial Services, Inc. ("PrimeVest"). (SUMF No. 3; *id.*). PrimeVest ███████████ ████████████████████ to Cetera Investment Services, LLC (hereinafter, "Cetera").

(SUMF No. 4; Deposition of Thomas Mitchell ("Mitchell Dep.") 147:23-148:12, Ex. 43 (A 000242)).

The Non-Disclosure Covenant that AAFCU seeks to enforce is contained in the 2008 Employment Agreement. That agreement defines confidential information as:

> non-public information and materials concerning AAFCU and/or its Clients, whether or not such information and materials are patentable or protectable by copyright, whether such information or materials are memorized, in hard copy, electronic or other form, including but not limited to information or materials concerning any of the following: Client information (including but not limited to lists of members and Clients, members' and Clients' names, contact information, finances, assets, liabilities, histories, preferences, and strategies, as well as any compilations of same).... *The term Confidential Information does not, however, include information that (a) has become known to the public generally through no fault of Employee....*

(SUMF No. 5; Am. Compl., Ex. A, ¶ 2) (emphasis added).

The Non-Solicitation provision that AAFCU seeks to enforce is also contained *only* in the 2008 Employment Agreement and purports to restrain Ms. Fonseca from:

> (a) solicit[ing] or accept[ing] Investment and Insurance Services business from any Client, or (b) solicit[ing], encourag[ing], induc[ing] or attempt[ing] to induce any Client to cancel, limit or postpone the Client's Investment and Insurance Services business with AAFCU, to transfer any of the Client's accounts away from AAFCU and/or to utilize Employee, directly or indirectly, for such Investment and Insurance Services.

(SUMF No. 6; Am. Compl., Ex. A, ¶ 3, Covenant Five).

"Investment and Insurance Services" are defined as follows in the 2008 Employment Agreement:

> Investment and Insurance Services. For the purposes of this Agreement, "Investment and Insurance Services" means providing brokerage, investment and/or insurance advice and/or selling brokerage, investment, insurance and/or other financial products to Clients (as defined in Paragraph 2 below) during Employee's Service.

(SUMF No. 7; *id.*, ¶ 1). The 2008 Employment Agreement is governed by Texas law. (SUMF No. 8; *id.*, ¶ 5, p. 7).

**B.    Information Mr. Fonseca provided Morgan Stanley is not confidential.**

No dispute exists as to what information Mr. Fonseca provided Morgan Stanley. He provided a summary document showing Mr. Fonseca's "trailing 12" gross revenue month-by-month which did not contain customer specific information. (SUMF No. 9; Fonseca Dep., 75:10-18; 77:14-78:5, Ex. 4 (SLK-FONSECA-000015-16)). He provided another gross "production report" from 2011 to 2015—which also contained only macro information related to Mr. Fonseca's production—found at Exhibit 8 to Mr. Fonseca's deposition. (SUMF No. 10; *id.*, 78:13-79:12, Ex. 8 (MSSB:AAFCU (Fonseca) 000613); Deposition of William Van Scoyoc ("Van Scoyoc Dep."), 78:19-79:24). And he provided an asset allocation of Mr. Fonseca's "book of business," *i.e.* what investments were held and the gross amount placed in each investment, found at Exhibit 9 to Mr. Fonseca's deposition. (SUMF No. 11; Fonseca Dep., 82:5-20, Ex. 9 (MSSB:AAFCU (Fonseca) 000313-26). Again, none of these documents contain client-specific information. (SUMF No. 12; *Id*; Fonseca Dep., 75:10-18; 77:14-78:5; 78:13-79:12, Ex. 8 (MSSB:AAFCU (Fonseca) 000613); Van Scoyoc Dep., 73:7-14; 78:19-79:24). As Mr. Van Scoyoc, Morgan Stanley's complex manager, explained in connection with the "asset allocation" document:

> Q. Okay. I mean, looking at the document, does it seem to provide the type of information that you would want to see in evaluating his assets under management at his previous employer?
> A. Yes. We would never want client information, 'cause we don't take that. So this is just a general breakdown of the assets themselves with what appears to be a total asset under management number there.

(Van Scoyoc Dep., 73:7-14).

5

In addition, no dispute exists that Mr. Fonseca did not take a customer list with him from AAFCU. Instead, he compiled his own customer information using his memory and the Internet, including Google searches and Spokeo. (SUMF No. 13; Fonseca Dep., 139:25-40:5; 140:21-141:9; 142:17-144:1; 147:13-148:24; 153:23-155:24; 161:8-19; 166:20-167:12).

C.    **AAFCU does not provide broker-dealer services.**

AAFCU is a credit union; it is not a broker-dealer or an insurance company and, thus, by law, is not permitted to offer brokerage services. (*See* SUMF No. 14; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 65:11-66:12; Mitchell Dep., Exs. 30 (A – 000160), 43 (A – 000242)). It is undisputed that AAFCU dually employs individuals, such as Mr. Fonseca, who provide broker-dealer services for registered broker-dealers like Cetera. (SUMF No. 15; *see* Deposition of Carlos Fonseca ("Fonseca Dep."), Ex. 5 (SLK-FONSECA-000020-22). Pursuant to this arrangement, AAFCU entered into a contract with Cetera titled Full Service Securities Agreement (the "Securities Agreement"), detailing the relationship between AAFCU and Cetera. (SUMF No. 16; *see* Mitchell Dep., Ex. 42 (A – 00329-61)). The Securities Agreement provides that ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████. (SUMF No. 17; *id.*, Ex.42 p. 1).[1]

D.    **Mr. Fonseca does not provide credit union services for Morgan Stanley.**

---

[1] In addition, Cetera and AAFCU explicitly agreed that ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████. (SUMF No. 18; *id.*, Ex.42 pp. 1-2). AAFCU ███████████████████████. (SUMF No. 19; *id.*).

6

Mr. Fonseca resigned from AAFCU and Cetera on May 8, 2015 to join Morgan Stanley. (SUMF No. 20; *see* Am. Compl., ¶ 10). Mr. Fonseca provides broker-dealer services at Morgan Stanley. (SUMF No. 21; Affidavit of Carlos Fonseca ("Fonseca Aff."), ¶ 6). The customers who opened accounts at Morgan Stanley did not move brokerage accounts from AAFCU to Morgan Stanley; they moved from *Cetera* to Morgan Stanley. (SUMF No. 22; Mitchell Dep., 47:9-13, Ex. 30 (A – 000160); Fonseca Dep., 96:9-97:7; 116:3-8). Indeed, AAFCU communicates to its customers that securities and insurance products are offered through Cetera and that advisory services may only be offered by an Investment Advisor Representative, like Mr. Fonseca. (SUMF No. 23; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, 63:25-66:12; Ex. 30 (A – 000160)). Although part of his employment at AAFCU was to recommend banking services at AAFCU, Mr. Fonseca did not provide any such services. (SUMF No. 24; *see* Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 74:22-75:23). Mr. Fonseca does not provide banking or other credit union services to clients on behalf of Morgan Stanley either. (SUMF No. 25; Fonseca Aff., ¶ 5).

E.     **AAFCU adopts the position throughout this litigation that the brokerage services previously provided by Mr. Fonseca through Cetera are "not at issue in this case."**

AAFCU's attorney laid out its position succinctly earlier in this case:

> The 2008 agreement is an umbrella agreement that applies to a range of activities beyond just the sale of registered securities. The 2010 agreement addresses a specific facet of the transaction which is Mr. Fonseca's ability to sell registered securities. Okay?
>
> The evidence will be from Mr. Mitchell that AAFCU would seek to enforce in court the noncompetition provisions of the 2008 agreement regardless of whether Mr. Fonseca was selling registered securities at his new organization.
>
> If he went over to Morgan Stanley and was just doing financial plans or if he went over to Morgan Stanley and was just dealing with mortgages or if he went over to Morgan Stanley and was just selling nonregistered products such as fixed annuities and fixed insurance, AAFCU would still seek to enforce in court that May 2008 agreement. And that's because of the access to that closed membership that Mr. Fonseca was provided.

7

> AAFCU cannot replace that. It's not a situation where it can go out and find new customers just off the street. Its only people that can be members are people who are in the airline industry. That's its business model.
>
> And to allow Mr. Fonseca to quote, unquote, steal those customers by soliciting them in violation of the noncompete agreement, by accepting their business in violation of the noncompete agreement, by using confidential information to solicit them in violation of the noncompete agreement, fundamentally upsets that business model.

(SUMF No. 26; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 43:11-44:21).

AAFCU maintains that Mr. Fonseca's work as a registered representative is simply "not at issue in this case." (SUMF No. 27; AAFCU's Memo. Opp. Mot. Dismiss, filed Nov. 3, 2015, p. 7). AAFCU stated that it is not suing pursuant to the 2010 Dual Employment Agreement and that the 2008 Employment Agreement and the 2010 Dual Employment Agreement "are separate and independent contracts each of which fulfill separate and distinct functions," while provisions in one agreement cannot be "imported" into the other. (SUMF No. 28; *id.*, pp. 6, 20). According to AAFCU, the 2010 Dual Employment Agreement "does not alter the basic terms of [the 2008 Employment Agreement] in any way," rather it is "merely a vehicle to facilitate Mr. Fonseca's ability to offer the full-range of services contemplated by his duties as a Financial Advisor." (SUMF No. 29; *id.*, pp. 6-7).

### III.   ARGUMENT

**A.   Standard of review.**

"Summary judgment should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment upon application of the law to the undisputed material facts." *Acosta, Inc. v. Nat'l Union Fire Ins. Co.*, 39 So. 3d 565, 573 (Fla. Dist. Ct. App. 1st Dist. 2010). Under Texas law, whether a restrictive covenant is a reasonable restraint of trade is a question of law for the court. *John R. Ray & Sons v. Stroman*, 923 S.W.2d 80, 85 (Tex. App. Houston 14th Dist. 1996). Restraints on trade "deserve rigorous legal scrutiny" and "should be

used sparingly and drafted narrowly." *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 788 (Tex. 2011) (Willet, J., concurring). "Naked restraints of trade" are not enforceable. *Id.* at 775-76.

**B.      AAFCU's Non-Use and Non-Disclosure Covenant is unenforceable.**

Texas courts hold that information "accessible by industry inquiry" or "from a phone book or comparable avenue of public access" is, as a matter of law, not confidential. *M. N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632-33 (Tex. App. 1992); *Miller Paper Co. v. Roberts Paper Co.*, NO. 07-95-0030-CV, 1995 Tex. App. LEXIS 1475, at **3-5 (App. June 30, 1995). Texas courts hold that the use of this information in rare occasions can be restricted—but only if the employee gains the information through a breach of confidence (and not through public inquiry). *See Anderson Chem. Co. v. Green*, 66 S.W.3d 434, 442-43 (Tex. App. 2001).

Here, no dispute exists that the customer information Mr. Fonseca utilized was compiled through his memory and public information on the Internet. (SUMF No. 13; Fonseca Dep., 139:25-40:5; 140:21-141:9; 142:17-144:1; 147:13-148:24; 153:23-155:24; 161:8-19; 166:20-167:12). He did not breach any confidence in compiling this information. Further, the contract provision states that the "[t]he term Confidential Information does not, however, include information that (a) has become known to the public generally through no fault of Employee...." (SUMF No. 5; Am. Compl., Ex. A, ¶ 2). Ultimately, the facts show that Mr. Fonseca's customer phone numbers and addresses are easily accessible from publicly available sources, and none of this information constitutes "confidential information" as a matter of law. If the Court were to hold otherwise and declare that Mr. Fonseca cannot use his memory of his customers' identities and look up contact information, this provision would transform into a *de facto* restrictive

covenant provision into perpetuity with no time limitation, which is unenforceable. Tex. Bus. &
Com. Code § 15.50.

Should Plaintiff argue that Mr. Fonseca's provision of certain gross production data to
Morgan Stanley somehow violated this provision, Plaintiff's position would be that Mr. Fonseca
can never provide any such information to a potential new employer and that he is contractually
obligated to remain an AAFCU employee for life. Such a provision would, of course, be
unenforceable. Moreover, the information AAFCU seeks to protect is not AAFCU information at
all, rather it is brokerage information belonging to Cetera, the broker dealer utilized to service
Mr. Fonseca's customers. Finally, AAFCU fails to, and cannot establish how, it has been
damaged by Mr. Fonseca's transmission of information belonging to Cetera.

**C.    Morgan Stanley and Mr. Fonseca did not misappropriate trade secret information.**

Mr. Fonseca and Morgan Stanley do not and never had any AAFCU trade secret
information in their possession.  Mr. Fonseca did not misappropriate trade secrets from AAFCU
and could not have used any such information after he was employed by Morgan Stanley.
AAFCU's misappropriation claim rests on Mr. Fonseca's compilation of customer names,
addresses and/or phone numbers using only his memory and the public record. (SUMF No. 13;
Fonseca Dep., 139:25-40:5; 140:21-141:9; 142:17-144:1; 147:13-148:24; 153:23-155:24; 161:8-
19; 166:20-167:12). Mr. Fonseca did not take any documents reflecting such information from
AAFCU. (*Id.*). The names, addresses and telephone numbers of customers serviced by Mr.
Fonseca are public information and not protectable trade secret information.

Florida law and not private contracts determines what qualifies as a "trade secret." To be
a protectable "trade secret," the information must "not be readily ascertainable by proper
means." Fla. Stat. Ann. § 688.002 (4). Customer lists are not trade secrets or confidential

information unless they contain information not generally known or readily available from public sources. *Barbiero-Powell v. Bernstein Leibstone Associates, Inc.*, 624 So.2d 383 (Fla. 4th DCA 1993) (reversing injunction against former employee due to lack of evidence a list was compiled at great expense or that the information was not otherwise available to the business community). Absent evidence that a customer list was the product of great expense or effort, that it was a distillation of a larger list, or that it included information not available from public sources, a customer list cannot be protected. *Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288 (Fla. 2d DCA 1989).

Therefore, Mr. Fonseca's compilation of customer names from memory and public information found on the Internet is not a trade secret. Mr. Fonseca did not take a list of any kind from AAFCU, but rather the customer information was compiled by his own efforts and from publically available sources.  Mr. Fonseca knew the identities of the clients he serviced.  "A former employee cannot be precluded from utilizing . . . customer lists she herself develops." *Mittenzwei v. Indus. Waste Serv., Inc.*, 618 So. 2d 328, 329-30 (Fla. 3d DCA 1993). Moreover, employees are free to reconstruct customer lists using their own memory and publicly available sources. *See Harry G. Blackstone, D.O. v. Dade City Osteopathic Clinic*, 511 So. 2d 1050, 1051-52 (Fla. 2d DCA 1987) (former employee did nothing wrong when he "compiled his list of addresses from patients themselves, from the phone book, and from his own memory").

AAFCU may argue that gross production and gross asset information that Mr. Fonseca provided Morgan Stanley constitutes a trade secret. Any such argument is untenable. This information cannot be a trade secret — it does not have independent economic value from being unknown.  Fla. Stat. Ann. § 688.002 (4)(a). This information comprised Mr. Fonseca's personal income earnings, monthly gross commissions, amounts of assets under his care, and general

11

types of investment holdings on a macro level. This information only had value for Mr. Fonseca, as it related directly to him, not AAFCU as a whole. Moreover, the gross production and asset information at issue did not belong to AAFCU, but Cetera. Cetera, by virtue of its noninvolvement in this case, does not believe this information to have independent economic value.

**D.     The non-solicitation provision is unenforceable under Texas law.**

Texas's "Covenants Not to Compete Act" provides, in part, as follows:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50.[2] Likewise, such a provision must not "take unfair advantage of the disparity of bargaining power between [employer and employee] or too severely impair the employee's personal freedom and economic mobility." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 854 n.10, 52 Tex. Sup. Ct. J. 616 (2009).

According to Texas courts, "[a] covenant is unreasonable if it is greater than required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." *Republic Servs., Inc. v. Rodriguez*, No. 14-12-01054-CV, 2014 WL 2936172, at *7 (Tex. App. June 26, 2014) (quoting *Zep. Mfg. Co. v. Harthcok*, 824 S.W.2d 654, 660 (Tex.App.-Dallas 1992, no writ)). Indeed, Texas courts hold that a plaintiff who cannot prove an unfair competitive disadvantage cannot enforce a restrictive covenant. The provision is unenforceable as no protectable business interest is at stake. *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 772 (Tex. 2011). Indeed, AAFCU is required to show "how" the restriction

---

[2] Texas courts have recognized that this statute applies equally to non-solicitation provisions as it does non-competition provisions. *Ally Fin., Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 Tex. App. LEXIS 792, at *16 n.5 (App. Jan. 23, 2014).

protects the alleged business-interest. *Wharton Physician Servs., P.A. v. Signature Gulf Coast Hosp., L.P.*, No. 13-14-00437-CV, 2016 Tex. App. LEXIS 348, at **11-12 (App. Jan. 14, 2016).

A restrictive covenant is overbroad and unenforceable when it restricts activity not related to the business of the employer. *See Diversified Human Res. Grp., Inc. v. Levinson-Polakoff*, 752 S.W.2d 8, 10-12 (Tex. App. 1988) (refusing to enforce a covenant not to compete restricting employee from engaging in *any* kind of personnel recruitment, including recruitment of insurance agents, as employer's business involved recruitment of data processing personnel). Texas courts hold that a restrictive covenant "must not restrain" an employee's activities in an area of business or in connection with professional services that "his former work has not...given him the opportunity" to pursue. *Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950, 952 (Tex. 1960); *see also Nw. Fed. Credit Union v. SBC Fin., LLC*, No. 1:16cv1299(JCC/JFA), 2016 U.S. Dist. LEXIS 149329, at **10-14 (E.D. Va. Oct. 27, 2016) (holding that "[p]laintiff fails to offer any...evidence of a legitimate business interest that would be served by prohibiting [defendants] from being employed in any capacity by a competing financial institution" and, as such, the restriction was overbroad and unenforceable, as it prohibited working in any role—even one that did not "directly use [defendants'] expertise"). In this case, AAFCU attempts to restrain the work that Mr. Fonseca performed as a registered representative for Cetera.

1.  Mr. Fonseca's work for Morgan Stanley does not compete with AAFCU, and, thus, AAFCU cannot establish that enforcing the restrictive covenant is required to prevent unfair competitive disadvantage.

Mr. Fonseca's work on behalf of Morgan Stanley does not compete with AAFCU—as the two entities do not offer competing services.[3] AAFCU is a credit union; it is not a broker-dealer or an insurance company. (SUMF No. 14, 23; Notice of Filing Hearing Transcript, dated Feb. 4,

---

[3] *See* BLACK'S LAW DICTIONARY 322 (9th ed. 2009) (defining "competition" as "...the effort or action of two or more commercial interests to obtain the same business from third parties").

2016, at 65:11-66:12; Mitchell Dep., Exs. 30, 43). AAFCU by law is not permitted to offer brokerage services. (*Id.*). Cetera provides those services. (SUMF 17-18; Mitchell Dep. Ex. 42 at pp. 1-2.) It is undisputed that Mr. Fonseca did not provide brokerage services for AAFCU; Mr. Fonseca did so for Cetera. (*Id.*; SUMF 15, Fonseca Dep. Ex. 5.) Customers have not moved their accounts from AAFCU to Morgan Stanley; in fact, AAFCU's own corporate representative testified that *the accounts are moving from Cetera to Morgan Stanley*. (SUMF 22; Mitchell Dep., 47:9-13; *see also* Fonseca Dep., 96:9-97:7; 116:3-8). As such, Cetera competes with Morgan Stanley in this situation—not AAFCU.

AAFCU seeks to restrain Mr. Fonseca from "solicit[ing] or accept[ing] Investment and Insurance Services business," including, "investment and/or insurance advice and/or selling brokerage, investment, insurance and/or other financial products" even though AAFCU does not offer such services.[4] (SUMF No. 6; Am. Compl., Ex. A, ¶ 3). No competitive disadvantage to AAFCU could result if the Court does not enforce the restrictive covenant at issue; thus the covenant is unenforceable. *See Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 772 (Tex. 2011).

Texas courts will not enforce a restrictive covenant not sufficiently related to the business of the employer. *See Diversified Human Res. Grp., Inc.*, 752 S.W.2d at 10-12. As noted, the restrictive covenant covers services that AAFCU does not and cannot offer. As such, the covenant is unenforceable. Case law outside of Texas yields few examples where a bank files a lawsuit against a broker-dealer over non-solicitation provisions. Of the two cases found, the

---

[4] Section (a) of the restrictive covenant is the only portion relevant to this case. Section (b) addresses factual circumstances which do not exist as it purports to limit activities related to "Investment and Insurance Services business *with AAFCU*" and restrictions related to moving accounts *from AAFCU*. (*See* Am. Compl., Ex. A, ¶ 3) (emphasis added). As noted, AAFCU does not offer brokerage services, so no such business is "with AAFCU," while any brokerage accounts at issue would be at Cetera—not AAFCU. (*See* Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 65:11-66:12; Mitchell Dep., 47:9-13; Fonseca Dep., 96:9-97:7; 116:3-8).

bank's broker-dealer was a plaintiff as well. In these cases, the courts melded the interests of both the plaintiff bank and plaintiff broker-dealer to find a legitimate interest justifying the restriction. *See Webster Bank, N.A. v. Cahill*, No. CV094018982S, 2009 Conn. Super. LEXIS 1672, at *4 (Super. Ct. June 16, 2009); *Fifth Third Bank v. Welch*, No. 09CVH-05-7343, 2009 Ohio Misc. LEXIS 544, at *24-25 (Ohio Ct. Com. Pl. June 12, 2009). In the instant case, Cetera is not a plaintiff and never alleged that Mr. Fonseca is subject to any restrictive covenant.

> 2.   The restrictive covenant is far greater than necessary to protect AAFCU's alleged "business interest."

Even assuming *arguendo* that AAFCU could establish that its alleged "business interest" is protected by the relevant restrictive covenant, the covenant, as written, is too broad to enforce. AAFCU admits that the business interest at issue is "access to the closed membership" of AAFCU. (Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 43:11-44:21). In short, AAFCU's position is that, even though it does not offer the services that Mr. Fonseca offers at Morgan Stanley, Mr. Fonseca should not be able to solicit its members for any purpose. AAFCU thus attempts to restrict financial services options offered to its members so that AAFCU can manipulate its compensation by forcing members to use AAFCU's pre-approved vendors—a blatant restraint on trade: "Where a naked restraint of trade masquerades as a covenant not to compete, we must strike it down—always." *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 788 (Tex. 2011) (Willet, J., concurring).

Blue-penciling a restrictive covenant is allowed under Texas law, and Texas courts will restrict based on the particular product at issue. *See Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 756-57 (S.D. Tex. 2009). As such, if AAFCU's argument was not simply a backdoor effort to restrict broker-dealer services (after repeatedly stating that broker-dealer services are not at issue in this case)— it should agree that Mr. Fonseca should only be restricted

15

from (a) entering into a dual-employment agreement with a credit union and a broker-dealer and (b) referring AAFCU clients to a credit union or bank that offers competing products to those offered by AAFCU. Any other restriction—goes far beyond the "scope of activity" necessary to protect AAFCU's interest in its closed membership base to which **it *only* offers credit union services.**

3.   AAFCU is judicially estopped from claiming Mr. Fonseca's provision of services as a registered representative to AAFCU customers at Morgan Stanley violates Mr. Fonseca's employment agreement.

The general rule under Florida law is that a party cannot assert inconsistent positions in judicial proceedings:

> It is a general rule that parties will be held to the theories upon which they secure action by the court, and in pursuance of the rule that a party may not take inconsistent positions in a litigation, he is bound by his election of the theory upon which he seeks recovery. So, one who assumes a particular attitude in a case and adopts a particular theory is generally estopped to assume in a pleading filed in a later phase of that same case, or another case, any other or inconsistent position toward the same parties and subject matter.

*Federated Mut. Implement & Hardware Ins. Co. v. Griffin*, 237 So. 2d 38, 41-42 (Fla. Dist. Ct. App. 1st Dist. 1970). The law provides that a party cannot "have his cake and eat it, too," *Fort v. Fort*, 167 So. 2d 315, 317-18 (Fla. Dist. Ct. App. 1st Dist. 1964), by taking inconsistent positions during the course of litigation.

In order to avoid arbitration, AAFCU argued in its opposition to the Motion to Compel Arbitration that Mr. Fonseca's "dual employment" with Cetera and his provision of brokerage services is not at issue. (*See* SUMF No. 26; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 43:11-44:21). As such, brokerage services cannot be at issue with regard to the Court's interpretation of AAFCU's restrictive covenant and its determination of AAFCU's alleged legitimate business interest. It is inequitable to allow AAFCU to argue that brokerage services

16

were not at issue at the beginning of the case only to allow AAFCU to change its position and argue that brokerage services are now at issue with respect to its claim for damages and permanent injunctive relief. The record is clear that Mr. Fonseca did not provide brokerage services for AAFCU. Thus, AAFCU cannot be awarded relief or damages for Mr. Fonseca's provision of brokerage services at Morgan Stanley, a registered broker dealer that does not compete with the credit union's services.

**E.    The non-acceptance/non-interference provisions are unenforceable under Texas law.**

As noted, the restrictive covenant AAFCU seeks to enforce also purports to prohibit Mr. Fonseca from *accepting* business from customers that decide to move their business to Morgan Stanley. This non-acceptance provision is unenforceable on its face as AAFCU is unable to articulate how restraining the decision of customers to join Morgan Stanley for servicing their securities accounts is necessary to prevent unfair competitive advantage.

Courts uniformly will not enforce "non-*acceptance*" covenants for several reasons, including, (1) "[t]here is a strong public policy interest in allowing third parties, not bound by the restrictive covenant, to make unencumbered decisions regarding those individuals and entities with whom they would like to do business," *Corporate Technologies, Inc. v. Harnett*, 943 F. Supp. 2d 233, 245 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013); and (2) because it is near impossible for an employer to display a protectable business interest in restricting the free will of third-parties. *See Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 570 (M.D. Pa. 2014); *see also Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 766 S.E.2d 187, 193 (Ga. Ct. App. 2014) ("Generally, a restrictive covenant may not validly preclude the employee from accepting unsolicited business from customers of his former employer."); *Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 419-21 (6th Cir. 2006) (applying Georgia law) (quoting *Waldeck v.*

17

*Curtis 1000, Inc.,* 583 S.E.2d 266 (Ga. Ct. App. 2003)) ("'[A] covenant prohibiting a former employee from merely accepting business, without any solicitation, is not reasonable.'").

Texas courts hold that restrictive covenants binding third parties are unenforceable. *Wharton Physician Servs., P.A. v. Signature Gulf Coast Hosp., L.P.,* No. 13-14-00437-CV, 2016 Tex. App. LEXIS 348, at *13 (App. Jan. 14, 2016). Further, Texas courts favorably cite the premise reflected in the case law above and, like the courts in these sister states, have not enforced non-acceptance provisions, as, among other things, such a restriction would "unreasonably impact[]...the public's ability to choose" a professional. *Peat Marwick Main & Co. v. Haass,* 818 S.W.2d 381, 387-88 (Tex. 1991).

Public policy demands that customers are given the freedom to choose with whom they deal. *See Unisource Worldwide, Inc. v. Schroeder,* No. 06-4007 RHKAJB, 2006 WL 3030887, at *7 (D. Minn. Oct. 23, 2006). "To enjoin the employee from providing services would unnecessarily infringe on the customer's exercise of choice in the person with whom the customer deals." *Raymond James & Assocs., Inc. v. Leonard & Co.,* 411 F. Supp. 2d 689, 695 (E.D. Mich. 2006) (*citing Hayes-Albion v. Kuberski,* 421 Mich. 170, 184, 364 N.W.2d 609, 615 (1984)); *see also Leon M. Reimer & Co., P.C. v. Cipolla,* 929 F. Supp. 154, 158-59 (S.D.N.Y. 1996) (noting a non-acceptance provision "unreasonably limits...clients' ability to choose professional services"). The restrictive covenant which AAFCU seeks to enforce violates this public policy.

The Financial Industry Regulatory Authority ("FINRA") governing broker-dealer services that AAFCU seeks to restrict recognizes the strong public policy regarding a customer's right to choose his or her advisor. In fact, FINRA prohibits the seeking of a judicial order barring or restricting the acceptance of a request to transfer a customer's account. FINRA Rule 2140.

Parties receiving a request for a customer account transfer are also obligated to "expedite and coordinate activities with respect to the transfer." FIRNA Rule 11870. AAFCU's restriction regarding non-acceptance thus violates public policy, as the restriction contravenes FINRA rules. Further, it is inconsistent for AAFCU to require Mr. Fonseca to abide by FINRA rules in its own 2008 Employment Agreement when AAFCU has no intention of doing so itself by seeking relief from this Court that interferes with the customer's right to choose their broker dealer. (*See* Am. Compl., Ex. A, ¶ 1).

F.   **Mr. Fonseca did not interfere with AAFCU's contractual and business relationships and he has not been unjustly enriched.**

Mr. Fonseca did not tortiously interfere with AAFCU's business expectancies. Under Florida law, to establish a claim for tortious interference with business relationships the plaintiff must prove: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship. *Toledo v. Hillsborough Cnty. Hosp. Auth.*, 841 So. 2d 482, 483 (Fla. 2d DCA 2003).

AAFCU cannot establish any intentional and unjustified interference. "[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980). Profit motive cannot be an improper means. *See id.* Instead, examples of improper means include those that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules, violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, duress, undue influence and methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition. *See*

19

Restatement (Second) of Torts § 767. In the absence of improper means, a plaintiff must prove that the defendant's motive was "purely malicious" in order to succeed on a tortious interference claim. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). As described above Mr. Fonseca did not take confidential information from AAFCU and the non-solicitation/non-acceptance/non-interference covenants are unenforceable. Without breach, there is no interference, no harm sustained, and no damage. Mr. Fonseca's motive cannot be "purely malicious" as he took no credit union information and acted responsibly in furtherance of FINRA's own rules. Because AAFCU's claims for breach of contract, misappropriation of trade secrets and tortious interference fail as a matter of law, the Court should also find that AAFCU's remaining claim for unjust enrichment also fails.

## IV.  CONCLUSION

For these reasons, the Court should grant summary judgment in favor of Defendants.

Respectfully submitted,

/s/ *Salvador M. Hernandez*
Timothy L. Warnock (FL Bar No. 850489)
Salvador M. Hernandez (FL Bar *pro hac vice* No. 104063)
Riley Warnock and Jacobson, PLC
1906 West End Ave.
Nashville, TN 37203
(615) 320-3700
twarnock@rwjplc.com
shernandez@rwjplc.com

*Attorneys for Morgan Stanley Smith Barney LLC*

-and-

/s/ *Michael Taaffe*
Michael Taaffe
Scott A. La Porta
Shumaker, Loop Kendrick, LLP
240 South Pineapple Avenue, 10th Floor
Sarasota, FL  34230-6948

20

*Attorneys for Carlos Hernan Fonseca*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answer was served by U.S. Mail and also via the Florida e-Filing Portal to the following:

Chad Heckman
Heckman Law Group
P.O. Box 12492
Tallahassee, Florida 32317

Martin P. Sipple
Ausley & McMullen, P.A.
123 South Calhoun Street
Tallahassee, FL 32301

on this November 13, 2017.

*/s/ Michael Taaffe*
Michael Taaffe
FL Bar # 490318
Scott A. La Porta
FL Bar# 0490490
Shumaker, Loop Kendrick, LLP
240 South Pineapple Avenue, 10th Floor
Sarasota, FL 34230-6948

21